J-S03041-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JASON PAUL GROW | : | |
| | : | |
| Appellant | : | No. 928 WDA 2021 |

Appeal from the Judgment of Sentence Entered July 14, 2021
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0003883-2020

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JASON PAUL GROW | : | |
| | : | |
| Appellant | : | No. 929 WDA 2021 |

Appeal from the Judgment of Sentence Entered July 14, 2021
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0000058-2021

BEFORE:  LAZARUS, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:          **FILED: FEBRUARY 24, 2022**

In these consolidated cases, Jason Paul Grow (Grow) appeals from the

judgment of sentence imposed by the Court of Common Pleas of Allegheny

_____

[*] Retired Senior Judge assigned to the Superior Court.

County (trial court) following his bench conviction of two counts each of terroristic threats and harassment at the above-listed docket numbers.[1] On appeal, Grow challenges the sufficiency of the evidence supporting his convictions. We affirm.

**I.**

This case arises from Grow's telephone and text message contact with Blythe Bort (Bort) on two separate occasions in April and May 2020. Bort is the mother of Grow's ex-girlfriend, Muriel McFadden-Bort (McFadden-Bort), who dated Grow for about one year beginning in the summer of 2019 when McFadden-Bort was 18 years old. The incidents were precipitated by Bort's involuntarily admission of McFadden-Bort into a mental health facility when her daughter represented that she did not want to live any longer at a time when she had been physically beaten. McFadden-Bort and Grow were living together at the time of the commitment. The trial court held separate bench trials concerning each telephone incident at which Bort was the sole witness.

**A.**

At Grow's May 12, 2021 trial, Bort testified that she recognized Grow's voice when he called her because she had previously spoken to him several times, including over the phone while he dated McFadden-Bort. During the

_____

[1] 18 Pa.C.S. §§ 2706(a)(1) and 2709(a)(4).

April 2020 telephone call, Grow was "really angry, using expletives." (N.T.

Trial, 5/12/21, at 15). Bort recounted her conversation with Grow as follows:

> [Grow] said, you took the only thing that I care about away from me. You're going to pay for this. I'm going to get you back. I'm going to kill you. I believe he said, I'm going to fucking kill you. And then midway through the conversation he sort of changed his tune and was saying things like, you know, she gave herself to me, she's mine, she doesn't care about you. This is kind of paraphrasing it because it's all like a whirlwind in your mind. But then he clearly started to say, you know, I'm going to take away the only thing you care about, your son, you won't know when it's going to come but I'm going to get him, I will end him, you'll never see him again. Things like this. That is to my memory. It was a year ago. There was a lot of expletives, a lot of attacks on me. You know, threats in my direction, to me first and then to my son.

(*Id.* at 15-16).[2]

At the conclusion of trial, the court convicted Grow of one count each of

terroristic threats and harassment. In doing so, it specifically found Bort

credible with respect to her identification of Grow's voice, based on her phone

and in-person interaction with him while he dated McFadden-Bort, in addition

to the context of the conversation itself. (*See id.* at 32-33). The court

determined that Grow's conduct was criminal and not merely an angry

outburst because "while it may have started out with anger and expletives, it

then proceeded to escalate to, I will kill you . . . and then ultimately a

---

[2] Bort has one son, Kyle Bort.

conclusion of, no, I would take away what you care about most, your son."

(***Id.*** at 33).

**B.**

Grow proceeded to a bench trial concerning the second incident on June 16, 2021. Bort testified that on May 30, 2020, at 3:00 a.m., Grow called her phone and directed her to put McFadden-Bort on the line. Bort was immediately fearful "because my daughter had left him and it was an abusive relationship and I had been threatened by him before." (N.T. Trial, 6/16/21, at 14). Bort recognized Grow's voice from previous phone calls and she described it as sounding "demanding and angry." (*Id.* at 15). Bort called 911 and picked up one call from Grow while she waited for the police to respond, in which he said: "I swear to God put her on the fucking phone, put her on the fucking phone. Blythe, get her on the fucking phone, I know she's there." (*Id.* at 18). Bort testified she knew of no one that held a grudge against her except for Grow.

Bort recounted that she received approximately 50 to 60 phone calls and 12 or 13 text messages from three different phone numbers during the incident. (*See id.* at 16, 18-19). Bort recognized one of the text messages as sent from the first telephone number Grow had used to call her. The text message read:

> Put her on the fucking phone now cause I have nothing else to fucking lose. Your [sic] going to see the monster if you don't put her on the phone. I am going to call one last fucking time and I promise Blythe your [sic] not going to like what I am about to do. So pick up the fucking phone cause I am down the road with a gas can full of gas so don't play with me bitch. That's why your daughter is fucking and sucking for drugs. . . . Yall want my

freedom then it will come with you and her life and I put that on my gram's grave . . .

You think I am a game but your daughter made the biggest mistake and you don't ever cross the fuck line like that. So if you want to save hers and your life then you better put her on the phone.

(Supplemental Record Exhibit A).

Bort then received the following text message from a different phone number that read in part: "Ok I am done trying to talk now you will see what you fear. You better have her call me before I get to your house." (*Id.*). From a third phone number, Bort received the following text message: "You do realize that I have nothing to lose right. . . . So put her on the phone or something like bad drugs can get slipped to her and you can watch her od in front of you. Hey I don't sleep much so I can do this all day and night. . . . And I got millions of numbers to call from." (*Id.*).

On cross-examination, Bort conceded that she had not saved any of these phone numbers into her phone as contacts or otherwise attributed a name to them. She explained that it was her practice not to do so because Grow and her daughter changed phone numbers frequently. Bort testified that although the speaker did not identify himself on the phone calls, she "knew who he was." (*Id.* at 31).

The trial court convicted Grow of one count each of terroristic threats and harassment, finding with respect to the text messages that Bort recognized the initial phone number as a number used by Grow and that the

messages clearly contained multiple threats of violence against her. Regarding the telephone calls, Bort was familiar with and able to identify Grow's voice. (*See id.* at 39).

On July 14, 2021, the trial court sentenced Grow at both docket numbers to an aggregate term of 6 to 12 months' incarceration followed by five years of probation. Grow timely appealed and he and the trial court complied with Rule 1925. *See* Pa.R.A.P. 1925(a)-(b).

## II.

Grow challenges the sufficiency of the evidence supporting his terroristic threats and harassment convictions at both docket numbers. With regard to the April 2020 telephone call, he claims that he impulsively "acted in the spur-of-the-moment to call his girlfriend's mother to confront her . . . in response to an unexpected and deeply upsetting event" after Bort involuntary committed McFadden-Bort. (Grow's Brief, at 23-24). As to the May 2020 incident, Grow contends the Commonwealth failed to demonstrate through the "unconnected text messages . . . the identity of the individual who texted on different phone numbers." (*Id.* at 25).[3]

---

[3]

> The evidence presented at trial is sufficient when, viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence and all reasonable inferences derived from the evidence are sufficient to establish all of the elements of the offense beyond a reasonable doubt. The Commonwealth may sustain its burden entirely by circumstantial evidence. When

To sustain a conviction for terroristic threats, the Commonwealth must prove that the defendant 1) made a threat to commit a crime of violence and 2) the threat was communicated with the intent to terrorize another. *See id.* (citing 18 Pa.C.S. § 2706(a)(1)). "The purpose of Section 2706 is to impose criminal liability on persons who make threats which seriously impair personal security. It is not intended by this section to penalize mere spur-of-the-moment threats which result from anger." *Id*. (citing 18 Pa.C.S. § 2706 cmt.). "When determining whether a statement constitutes a terroristic threat, we must look at the statement in light of all of the surrounding circumstances." *Id.* (citation omitted).

"A person commits the crime of harassment when, with intent to harass, annoy or alarm another, the person: . . . (4) communicates to or about such other person any lewd, lascivious, threatening or obscene words, language, drawings or caricatures[.]" 18 Pa.C.S. § 2709(a)(4). "An intent to harass may be inferred from the totality of the circumstances." *Commonwealth v. Cox*, 72 A.3d 719, 721 (Pa. Super. 2013) (citation omitted).

---

determining whether the defendant had the requisite intent to commit a crime, the fact-finder is free to conclude that the defendant intended the natural and probable consequences of his actions.

*Commonwealth v. Campbell*, 253 A.3d 346, 348 (Pa. Super. 2021) (citations omitted).

Instantly, Bort's testimony reflects the April 2020 phone call escalated from Grow's initial utterance of angry expletives to his communication of direct threats of violence against Bort and her son. During both the April and May episodes, Grow intimated an intention to cause serious physical harm and/or death to Bort and her family. The episodes were prolonged in nature and conveyed much more than a transitory reaction of anger.

Regarding Grow's contention that the Commonwealth failed to establish his identity as the author of the text messages, his own argument makes clear that during the relevant timeframe, he was very much opposed to and angry about McFadden-Bort's involuntary commitment to a mental health facility, initiated by Bort. Therefore, viewed in context, it makes sense that Grow communicated his displeasure about the situation to Bort, especially considering Bort's testimony that Grow was the only person she was aware of who held a grudge against her. Additionally, Bort credibly testified that she recognized a phone number that Grow used to text her.

Viewing the totality of the circumstances in the light most favorable to the Commonwealth, *see Campbell*, *supra* at 348, the evidence is sufficient to demonstrate that Grow terrorized and harassed Bort using his "millions of numbers to call from" on the two occasions at issue. Grow's challenge to the sufficiency of the evidence merits no relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/24/2022